I will call the case of Kendra Munoz v. Selig Enterprises, Inc. Good morning, Your Honors, and may it please the Court. I'm Cheryl Legrand. I represent the appellant, Kendra Munoz, in this matter. Ms. Munoz brings this appeal because the district court wrongly denied her a jury trial where Selig Enterprises interfered with her rights under the Family and Medical Leave Act, retaliated against her for exercising her rights under the FMLA, and failed to accommodate her disability under the Americans with Disabilities Act. We respectfully request that the Court reverse the lower court and remand this action for a jury trial on the merits. In 2011, Ms. Munoz began treatment for serious health conditions that were later diagnosed as urinary fibroids, ovarian cysts, and endometriosis. Ms. Munoz was very open with her supervisors, Kent Walker and Jim Sain, about her serious health conditions and the symptoms of those serious health conditions. Her symptoms included extreme pain, exhaustion, sleep interruption, and lack of bodily function control, and ultimately, Ms. Munoz lost the ability to procreate. On April 30, 2013, Ms. Munoz shared with Mr. Sain and Mr. Walker that she finally had a diagnosis of endometriosis and would begin treatment on May 1, 2013. Until that point, she had been open with them about the fact that she had the uterine fibroids and the ovarian cysts, but had not yet been diagnosed with the endometriosis. She finally was on April 30, 2013. Almost as soon as Ms. Munoz shared her diagnosis and the fact that she would be seeking further treatment with Mr. Sain and Mr. Walker, Mr. Walker began to paper her file to set her up for termination. 37 days later, after she told them about her endometriosis... Well, doesn't the record indicate that there were a lot of other things going on with her, that they were having a great deal of difficulty with her, her defensiveness, her attitude? There's this email chain, which I would think any boss would find disturbing, where she didn't do what she was supposed to do and was kind of truculent about the whole thing. Would you concede there are other things going on in terms of her performance? Your Honor, we would concede that there were issues with her performance. However, Ms. Munoz hadn't been disciplined since January 2010. All of a sudden, on April 30, 2013, she shares with her bosses that she has an actual diagnosis of endometriosis, which one of her bosses, Mr. Walker, was at least somewhat familiar with because of health issues that his wife had had. And the next thing you know, 37 days later, she's terminated. And she was not terminated for the performance issues. She was terminated because she would not sign the performance improvement plan. Because she believed that she could not sign the performance improvement plan because they told her if she didn't correct the issues raised in the meeting, she would be terminated. And a large portion of the meeting was spent discussing her tardiness, her absences, and the fact that she had to leave early for a doctor's appointment, sometimes on very little notice because she would get squeezed in to see her doctor. My understanding was they simply wanted her, that they asked her to sign the memo just to acknowledge they've talked over these issues, one of which was her attendance problems. But others were the record indicates they had found she was helping her husband write a screenplay or something. She was doing all sorts of things, not her job, and was having trouble with her job. And when they asked her not to do that, I thought she acknowledges that her explanation was not, I'll stop doing that, but that she was a really good multitasker. So when they asked her to sign this memo, tell me if I'm wrong, they're asking her simply to acknowledge that they've had this conversation. Is that not accurate? That is not accurate, Your Honor. That was the case with the January 2010 memo, but that was not the case here. Mr. Stain, Mr. Walker, and my client, Ms. Munoz, all testified that nobody said they were asking her to just acknowledge that she received it. And nobody told her that she could... What is the position they were asking her to do? I'm sorry? What did she say her signature was committing her to do? She believed, and she told them that she believed, that her signature committed her to not being party anymore, despite the fact that she had just gotten the endometriosis diagnosis. She didn't believe she could comply with the memo for that reason. And she told them that, repeatedly. They dispute that she told them that, of course, but that's a standard summary judgment issue. That's a standard issue of fact that should be left to the jury to decide. This is Judge Newsom. Can I ask you a quick question about your ADA claim in particular? What is the major life activity of which there is evidence of an impact beyond the diagnosis itself? I would have thought that that evidence would have been pretty easy to put on, but I'm not aware that it's before us. Well, Your Honor, she suffered chronic pain that interfered with her sleep and her ability to get to work on time, because of the interference with the sleep and the interference with pain. My client testified that she was in excruciating pain, that she had difficulty at times leaving her house. She lost bodily function control, of which her bosses were aware. I mean, ultimately, she had a hysterectomy. That, of course, was after her termination. Yes. So, I mean, I guess I would have thought that you might have been traveling down one of two roads, either the major life activity of work or the major life activity of reproduction. But at least as to work, I mean, didn't she acknowledge that despite the impairment, she could continue to perform her duties? And the doctor said there was nothing that she needed to do to alter her work? So, I mean, I'm not really sure that the work path works, and then I'm not really sure that there is evidence on the reproduction side. Well, the evidence on the reproduction side, Your Honor, and I guess I need to answer both questions, but the evidence on that is she ultimately ended up having hysterectomy. So, it did affect her reproduction. She became gravely, you know, her illness was progressing over time and became substantially worse after she was terminated because she lost her health insurance and couldn't get treatment. However, there's no way to tell when she would have had the hysterectomy otherwise. Now, with respect to the work issue, my client testified that she was capable of performing her job, but she needed the accommodation. In order to perform her job, she needed a flexible work schedule. And she does not believe, and frankly, there's some evidence in the record from the other side too, from the defendants too, that her performance itself was, the actual technical performance of her job was not the issue. But if you look at the performance memo given to her on June 6, 2013, included on there was the tardiness. So, that shows that her disability did affect her ability to work because she was being disciplined for being tardy because of her disability. Well, except that she's tardy a lot of time for many years way before her illness, and she acknowledges a lot of her tardies have nothing to do with being ill. I just pulled up the memorandum, and I read that it indicated that they have serious concerns about her attitude and work performance. They want her to make improvements. They talk about her defensiveness and questioned about past excessive tardiness, failure to get consent before she changes her working hours, failing to give notice for leave, spending excessive amount of the day working on personal matters, and an attitude that results in a difficult work environment and has negatively affected the department. At the end, it says she was told the failure to make these changes will lead to further discipline. And it says the below parties acknowledge receipt of the memorandum. I see nothing in there that indicates that by signing this, she would indicate that suddenly she could no longer take leave or anything like that. I don't read this as anything but a normal obligation for an employee who's met with her employer to just say, yeah, I read it. Not necessarily agree with it, but I read it. You disagree with that interpretation? Your Honor, I do disagree with that interpretation. They're telling her failure to comply with this memo can lead to discipline up to termination. All they're telling her is just sign this if that's what we've told you, not that you agree with that interpretation. Well, they're also telling her you will be fired if you don't comply. All right, we simply disagree on that. In any event, going back to the June... This is Beverly Martin. Good morning. Good morning, Your Honor. I've got this grid, which I'm wondering if I have it right. So for the Family Medical Leave Act claims, you have the interference claim and the retaliation claim. And am I correct that the claim that she was willfully fired because she needed leave would fit under... You're arguing those under both. Am I right about that? Yes, Your Honor. The adverse employment action for both claims is the termination. Okay. All right. Yes. And in the case law, there's plenty of case law that says that you can have both an interference and a retaliation claim arising out of the same adverse employment action. You know, Batson v. Salvation Army, among others. Right. And then the other... And you have two claims under each of the two claims, but I just wanted to make sure that was the same one for both. And the retaliation claim is the... The other retaliation claim is refusing... She was fired because she refused a performance document that you and Judge Karnes had been discussing. Yes, Your Honor. That was the only reason identified for my client's termination, that she refused to sign the document. She gave extensive testimony about why she refused to sign it. She made that statement, or she gave that testimony relating to the meeting and the fact that she was very clear with Mr. Sane and Mr. Walker that the only reason she wouldn't sign it is because she did not believe she could comply because of her serious health conditions and her disabilities. And Mr. Sane, he responded, who's sick that long? You've been sick for over a year. Who's sick that long? Which, you know, first of all, I think that's evidence of discriminatory and retaliatory intent. But second of all, it's also evidence that he had noticed that my client was suffering from a serious health condition and a disability. You know, that's an admission by him that he knew how sick she had been. And the district court and the magistrate judge both... Counsel, your time has expired. Thank you. We'll hear from you on rebuttal. Yes, thank you. Good morning. I'm Tracy Maurer. I am honored this morning to represent the appellee, Sue with Enterprises. May it please the court. Could you speak louder or get off speakerphone? Thanks. Yes. Is that better? Much better. Okay. I apologize for that. I certainly will talk about the law, but I do want to say that I think there are some facts that are quite central to the claims that Ms. Munoz is appealing from the summary judgment. And I think that the summary judgment order should be affirmed for good reason. The first thing is Ms. Munoz admitted that at no time during her employment was she denied or refused any leave or accommodation that she now claims that she requested. That gets rid of her ADA accommodation claims. It gets rid of her FMLA interference claims as well. Ms. Munoz had a history of tardiness throughout her employment with the company. I mean, multiple tardiness, multiple years that she'd been with the company. The only thing that they asked her to do was to provide some notice that she was going to be out and to, you know, work with them and make sure that the work that she was doing, the work that they needed from her, was getting done. That is the core of that June 6th memo with them and the June 6th meeting with Ms. Munoz. Despite her multiple-year history of tardiness, she suffered zero related consequences or negative actions because of any tardiness, whether that be tardiness, early leaving, or a full-day absence. She was never, she received bonuses and raises every year, which she admitted. She admitted that her tardiness was never credited against her PTO bank. She admitted that there had been no deductions from her pay so long as she came to work at least five hours a day. And so the notion that she was not provided with what amounted to FMLA rights for whatever the reason is certainly not supported by the evidence in this case. This is Beverly Martin. I wanted to just ask you about the termination claim that apparently comes under both the interference and retaliation claims. The Family Medical Leave Act does not set a notice requirement for, you know, when the disability, the need for leave is unforeseeable. Didn't the district court make a mistake by treating this purely as a foreseeable disability that caused her to not give proper notice? No, and I believe, Judge, that Section 303 of the 825 Section 303 does require some sort of notice to the employer. It may not be the 30 days that are required under 302, but 303 does say that, you know, you need to provide some sort of notice as soon as practicable. But if I'm understanding correctly, that was not the standard that the district court or the magistrate judge used. That is correct. That is correct, Your Honor. But that goes to the issue of whether under her FMLA retaliation claim, whether she engaged in protected activity. And the judge ruled that if she did not engage in protected activity because she hadn't determined or had not proven that she was entitled to an FMLA right as of determination. And even if the judge may have gotten that part wrong, it still doesn't change the fact that we're still going through the burden-shifting analysis. Even if we have presumed that she had engaged in protected activity, it doesn't change the fact that there were still legitimate reasons for why her employment ultimately was terminated. During that meeting, as you all have noted, she was asked to sign a document very similar to a document that she had signed in 2010. We've had a meeting with you. We want you to acknowledge that this meeting has occurred and this is what our expectations are of you. In 2010, she took it upon herself to draft her own notice response to the meeting that they all signed. They signed the document that they had prepared to outline what they had discussed. They all signed that. She came back with her own version of it. They all signed that. There was certainly some precedent for the notion of we're asking you to acknowledge this. They brought up similar issues in 2010 that were raised in 2013 when her employment ultimately was terminated. The difference, however, was not because she told her bosses, who deny, of course, that she did, that she told her bosses that she had been diagnosed with endometriosis. The difference is that over the time, she continued or became increasingly combative, increasingly defensive. One of her bosses, Jim Sain, testified that he didn't give her work anymore because he wasn't getting it done. Her other supervisor, Kent Walker, testified that he didn't want to have her do work for him often as well because he didn't know what he was going to get. He didn't want the pushback. All he wanted her to do was to complete the work. That's what the change was. This is Judge Newsom. Let me ask you just a quick question. Even if we pierce through to the third stage of the burden shifting and we get through to pretext, isn't the same statement to her just before firing her, no one is sick that long, in effect, I don't believe you, isn't that pretty damning? No, not when we look at the history between these folks. That statement was born of frustration. It was, I can't believe that you are trying to lump everything into, and I think he testifies to this, you're trying to lump everything, all of these years and this long pattern and history of tardiness into I've been sick. I guess my question is this. He says it was born of frustration. She says it's born of animus. Why isn't that a jury question? The record doesn't support that it was born of animus. What the record supports is that... The record viewed in the light most favorable to her. It is. Yes, I understand that. And when we look at the record most favorable to her, the record is that this is someone who has had eight years of tardiness, extensive tardiness, and she's never been asked to suffer any consequences for that. She doesn't want to be held accountable and she made it clear. How about this fact that once she communicates her actual diagnosis, then 37 days later, she's fired? I mean, oftentimes in these cases, proximity is considered in deciding whether there's a dispute of fact that goes to a jury. So, I think we have to construe that fact in her favor, don't we? Again, I think, Your Honor, if we look at the totality of the record and the issues that were going on and we look at what preceded the meeting, we have the communication between Jim Sain and Ms. Munoz and one of their clients. The email communication that was referenced earlier. Aren't you asking us to evaluate the conflicting evidence? And isn't that something we can't do on papers? No. I'm sorry, Judge. No, no. Ms. Munoz acknowledged that that happened. She acknowledged that the reasons that were outlined in their June 6th meeting occurred. She acknowledged that she's not denying that the reasons that they brought to her attention and the concerns that they had occurred. Although she's now saying that this was all because of her illness, there's nothing in the record to demonstrate that there were any other circumstances to suggest that her illness had anything to do with them asking her to be less defensive or less combative or to get the work done that they're asking her to get done. Those reasons are undisputed here. And there are reasons that a reasonable employer would have for deciding that they have an opportunity or should have an opportunity to sit down with her. That was the same thing that they had done in 2010 when they'd gotten to this point of having these concerns with what was going on with their working relationship. They sat down with her and then they were able to progress. And then these concerns continued or came up again. This is no different than what happened then. Except she didn't get fired in 2010. She did not. She did not get fired in 2010. The problem is that her attitude, her combativeness, her defensiveness continued and it increased over time to the point where they weren't getting the work done. I mean, ultimately, her job was to be the administrative assistant that they had hired her and asked her to be. When that became an issue, when it became the issue of we can't even talk to you about the work that needs to be done, we can't give you the work and rely on you to get it done because you're doing your own personal things, or we can't have a discussion with you or you're not doing the things that we're asking you to do, that was the change that happened over time. That was what was going on. And Jim Sain said immediately after that April exchange with Ms. Munoz and the client, I'm really disturbed by this. I'm really disturbed by this. And that's when he did what a good employer would do, which is to sit down with her and say, you know, we need to talk about this. With respect to the claims of her ADA claim, again, for the same reasons that I mentioned earlier, Your Honor, that claim, the claim for failure to accommodate also should be affirmed by the district court. The district court's opinion should be affirmed on that. Ms. Munoz's... May I ask a question? My understanding of the district court order that he found that she was not disabled but didn't really address her allegation that her sickness interfered with major life activities of sleeping, walking, driving, working, all those things, which is a factor in determining whether there's a disability, which I don't believe was considered by the district court. Ultimately, whether she was disabled, frankly, from our standpoint, does not, even if she were determined by the district court to be disabled or not disabled, the ultimate question was, did my client fail to accommodate her? But if you don't mind, this is Judge Newsom. I would appreciate you answering Judge Martin's question because you could probably tell in my questioning of your adversary, I've got genuine questions about the disability point. I just want to know what the evidence is. I'm not saying that it exists or it doesn't, but what the evidence is that there was an impact on a major life activity. I just want to make sure I've got that straight. Yes, sir. There was no, other than the affidavit that Ms. Munoz provided in the response to our motion for summary judgment, there was no evidence of her being disabled. She produced hundreds of pages of medical records, and there was nothing in those records, and she testified that her doctors had not said that there was anything that limited her or that required her to alter work, in particular work. And she did not, the doctors did not require or request that she have a flexible work schedule or anything along those lines. And counsel talked about having the inability to procreate, but that was four years. She had a hysterectomy four years after her employment was terminated. So for purposes of whether she produced sufficient evidence or produced evidence of a disability, what she talked about were she didn't provide any sort of parameters or any sort of examples of how long she was having the issues that she claimed to have been having to demonstrate that there was, in fact, a disability, an ADA-qualifying disability, as opposed to being ill. It's easier, I'm sure, to look back at the fact of where she, look back now, considering that she's now had a hysterectomy. But at the time, there was not that information there, and there was not, she did not even allege in her complaint that she had, that there was a major life activity that had been impacted by her illness. Thank you. I think that my time is up. Thank you, Your Honor. I'd just like to address a few points made by opposing counsel. Number one is the foreseeability and unforeseeability of the need for FMLA. Proceeding under 303 for an unforeseeable chronic condition, Ms. Munoz was not required to provide information about the timing and duration of her leave in order for Sealy to be put on notice that she needed FMLA leave. And I understand that Sealy's position is, well, she got all the leave to which she was entitled, but that's simply not true because she had a chronic health condition under which she would need additional leave that she would have been entitled to under the FMLA and under the ADA as an accommodation. And Ms. Munoz herself testified, well, it seems that I was being provided accommodation for the tardies in the late and sick days, but at the end of the day, I really wasn't because I was fired. And that's on page 78 of her deposition. Was she not the author of her own destiny? Had she simply signed this form, testimony is they weren't going to fire her, and of course, why would they? They had the form, she signed it. She could at that point, it would have played out and we would have seen in terms of her leave, did they fire her because she continued to take leave. But as it was, it seems to me a very simple request by an employer for a very recalcitrant employee who leaving aside her tardiness, even when she's there, people aren't giving her work. She's difficult. All she had to do was sign the form. Is she not responsible for the termination that occurred after that? Your Honor, no, she is not responsible. She told them exactly why she wasn't signing the form. She didn't feel like she could. She felt like she was being set up for termination based on her tardiness. It's important to point out, I heard what opposing counsel said about her performance, but her boss, Mr. Sain, testified that between the first and only other time that she was written up in January 2010 and her termination on June 6th, her performance improved. She was never written up or disciplined and that's in Mr. Sain's deposition, docket 53 at page 19 through 21 and Mr. Walker's deposition, docket 55, 17 through 18. In addition, Ms. Munoz's testimony is she had no idea that Mr. Sain and Mr. Walker had concerns with her performance between January 2010 and June 6th, 2013 because they did not tell her they had any concerns with her performance. I thought they were talking to her about all her personal activities and she explained to them that she was a great multitasker. Only after she told them she had endometriosis. Vaughn versus World Changers is the case most on point about this issue. She told them on April 30th that she was diagnosed with endometriosis and would be seeking further treatment. Immediately following that, Mr. Walker started spying on her computer. He had never done it before that. He asked for her attendance from Jody Johnson, the person in charge of attendance and that attendance list that he asked for included tardies that were related to her health issues. Well hadn't we also had an incident on April 16th just before that where we have this email chain where she had refused, had not done what he had asked her to do and the client was getting quite upset. It's all happening around the same time, correct? Ms. Munoz's testimony about that email is that she didn't recall it at all. It was not out of the ordinary. It was the kind of email they normally had. You mean that she normally shrugged her duties and they were always, they were always having to tell her to do things and she refused to do them? Not at all, Your Honor. It was the way that they communicated. They discussed back and forth. They were like a family is the way that she testified about it. They had been working together since 2005 and he never raised the issue with her at the time. He did not address her about the email. He didn't add it to a performance issue until she told him she was sick and she was seeking further treatment for her endometriosis. Counsel, can I ask you one just housekeeping question and I really do apologize if you might have explained this already but so in the Statement of Undisputed Material Facts Yes, Your Honor. Munoz says, he admits that at no time during her employment was she ever denied or refused any leave or accommodation that she now claims to have requested. Is that true? Was it an error? No, Your Honor. She admits that she was given the leave. She was only later disciplined for it. So it was a negative factor in her discipline and the leave would have continued. Hold on one second. Sure, sure. I'm trying to pick up on the language of the statute. I mean at no time during her employment was she denied or refused any, we'll say dot, dot, dot, accommodation that she now claims. Yes, Your Honor. And Ms. Munoz's testimony about that is she believed she was being accommodated until she went to that meeting on June 6th and saw that she was being written up for things that she thought she was being accommodated. But more importantly, that issue is this. When they terminated her employment, she no longer got the leave to which she was entitled. And the case law is very clear that if you have a continuing entitlement to leave, a termination is then an interference with that continuing entitlement to leave. Yeah, I get it. As Judge Martin said, you've got kind of like subclaims under your claim. You've got the firing of the discrimination. But you do have a failure to accommodate claim, right? Correct. And so does that admission in the statement of undisputed material facts not sort of torpedo the failure to accommodate claim? At no time during my employment was I ever denied an accommodation? Your Honor, we don't believe it does because just like her FMLA leave, her accommodation was an ongoing thing that when they decided to terminate her, the accommodation went away. Okay. All right. I'll figure it out. Thank you, Your Honor. I appreciate the time today. We appreciate you coming. Thank you very much. That concludes our arguments for the week, actually. So we appreciate the presentation and court is adjourned. Thank you. Thank you.